UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

RENADE GRANT,

      Plaintiff,

v.                                                         Case No. 0:16-cv-62966-RNS

SELECT PORTFOLIO SERVICING, INC.,

      Defendant.

_____/

## AFFIDAVIT

BEFORE ME this day personally appeared Daniel Maynes, who, after being duly sworn, deposes and says:

1.     I am more than eighteen (18) years-old and competent to testify to the matters contained herein.

2.     I am employed by Select Portfolio Servicing, Inc. ("**SPS**") as a Document Control Officer for SPS, where I have worked for a number of years.

3.     I have been directly involved with the administration of the loan involved in this action which is described herein (the "**Loan**").

4.     SPS maintains a computer database (the "**Loan Records**") of acts, transactions, payments, communications, escrow account activity, disbursements, events, and analyses (the "**Loan Transactions**") with respect to the mortgage loans it owns. The information described herein and referenced below is found in SPS's business records. The entries in those records are made at the time of the events and conditions they describe either by people with first-hand knowledge of those events and conditions or from information provided by people with such first-hand knowledge. Maintenance of the business records occurred in the ordinary course of

SPS's business, as a regular and routine business practice. I have access to the Loan Records with respect to the subject loan, and have personal knowledge of how they are maintained. Based upon my review of those records, I have gained knowledge of the facts set forth herein and, if called upon as a witness to testify, could and would competently testify as to those facts, under penalty of perjury.

5.     Plaintiff is the borrower under a loan evidenced by a note (the "**Note**") and a mortgage (the "**Mortgage**"), which Mortgage is secured to the property located at 1901 South Roosevelt Blvd. #108N, Key West, FL 33040 (the "**Property**"), and was recorded on November 7, 2006 in the Official Records of Monroe County, Florida in Book 2250 at Page 477.  True and correct copies of the Note and Mortgage are attached hereto as **Exhibits A and B**, respectively (collectively, the "**Loan**").

6.     On March 23, 2010, Mortgage Electronic Registration Systems, Inc. ("**MERS**"), the original mortgagee acting as nominee for the original lender, executed an Assignment of Mortgage evidencing that the Mortgage had been transferred to Deutsche Bank National Trust Company, as Trustee, in Trust for the Registered Holder of Morgan Stanley ABS Capital I Inc. Trust 2007-HES, Mortgage Pass-Through Certificates, Series 2007-HE5 ("**Deutsche Bank**"), which Assignment was recorded in the Official Records of Monroe County, Florida on October 25, 2010 in Book 2488 at Page 2184. Deutsche Bank is the current mortgagee of the Mortgage and has been the mortgagee continuously since on or before March 23, 2010. A true and correct copy of the Assignment of Mortgage is attached hereto as **Exhibit C**.

7.     SPS currently services the Loan on behalf of Deutsche Bank, as Deutsche Bank's agent and attorney-in-fact, and has done so continuously since August 2012. Attached hereto as **Exhibit D** is a true and correct copy of a limited power of attorney which memorializes SPS's

agency and authority to act on behalf of Deutsche Bank, which was recorded in the Official Records of Salt Lake County, Utah on October 22, 2012 (the "**Power of Attorney**").

8.      At all times since August 2012, SPS has been acting on behalf of Deutsche Bank in connection with SPS' communications and other conduct with Plaintiff. Each and every call that SPS has placed to Plaintiff since SPS began servicing the Loan in August 2012 were to discuss the subject Property, including without limitation, to discuss possible workout and loss mitigation options. At all relevant times SPS was acting as the agent and attorney-in-fact for the mortgagee, Deutsche Bank.

**FURTHER AFFIANT SAYETH NAUGHT**

By:  Select Portfolio Servicing, Inc.

_Dwayne_   3/9/17
Daniel Maynes
As: Document Control Officer

STATE OF UTAH
COUNTY OF SALT LAKE

Signed and sworn to (or affirmed) before me this __9th__ day of March, 2017, by Daniel Maynes,   who   is   (✓)   personally   known   to   me   or   (__)   has   produced _____ as identification.   _Luisa Alfonso_

Notary Public

_Luisa Alfonso_
Printed Name of Notary Public

LUISA ALFONSO
Notary Public  State of Utah
My Commission Expires on:
October 5, 2018
Comm. Number: 679563

3

# EXHIBIT A

11-08097

# ADJUSTABLE RATE NOTE
### (6-Month LIBOR Index - Rate Caps)
### (First Business Day of Preceding Month Lookback)

GRANT

Serv #: 11714927

Loan #: 11714927
MIN: 100136300117149277

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

October 25, 2006        CORAL SPRING                    Florida
[Date]                  [City]                         [State]

1901 SOUTH ROOSEVELT BOULEVARD # 108N KEY WEST, FL 33040

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ **543,750.00**        (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **WMC MORTGAGE CORP.**

. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **8.620** %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the **1st** day of each month beginning on **December 1, 2006**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **November 1, 2036**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **4828 Loop Central Drive, Houston, TX 77081-2226** or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ **4,035.91**. This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on the first day of **November, 2008**, and may change on that day every **6th** month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the six month London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal*. The most recent

FLORIDA ADJUSTABLE RATE NOTE – 6-month LIBOR ___ k) – Single Family –

DOCUJ1H1
DOCUJ1H1.VTX  02/08/2006



610  073942376  N  001  001

11714927             11714927

Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Six and Eighty-Five Hundredths** percentage point(s) ( **6.850** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on a date that is **10** years after the Maturity Date (such date being referred to herein as the "Amortization Date") at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment. I understand that as a result of the Amortization Date being after the Maturity Date, I will have a balloon payment on the Maturity Date.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **11.620** % or less than **8.620** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One** percentage point(s) ( **1.000** %) from the rate of interest I have been paying for the preceding **6** months. My interest rate will never be greater than **15.120** %, or less than **8.620** %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000** %



11714927                                                                11714927

of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given

**FLORIDA ADJUSTABLE RATE NOTE – 6-month LIBOR Index (First Business Day Lookback) – Single Family –**

DOCUJ1H3
DOCUJ1H3.VTX   02/08/2006





11714927                                                                                                      11714927

in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**12. DOCUMENTARY TAX**

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____   10/25/06

- Borrower - RENADE A GRANT - Date/-



Pay to the order of
without recourse
Alex Arguello, Asst. Sect.
WMC Mortgage Corp.

[Sign Original Only]

**FLORIDA ADJUSTABLE RATE NOTE – 6-month LIBOR Index (First Business Day Lookback) – Single Family –**
DOCUJ1H4
DOCUJ1H4.VTX   05/23/2006

## ADDENDUM TO ADJUSTABLE RATE NOTE

Servicing #: 11714927

GRANT
Loan #:     11714927
MIN:       100136300117149277

THIS ADDENDUM is made this **25th** day of **October, 2006** and is incorporated into and shall be deemed to amend and supplement the Adjustable Rate Note made by the undersigned (the "Borrower") in favor of **WMC MORTGAGE CORP.**

(the "Lender") and dated the same date as this Addendum.

ADDITIONAL COVENANTS. In addition to the covenants and agreements in the Security Instrument, Borrower and Lender further covenant and agree as follows (despite anything to the contrary contained in the Security Instrument or Adjustable Rate Note):

**NOTWITHSTANDING THE 40 -YEAR AMORTIZATION PERIOD, THIS LOAN IS PAYABLE IN FULL ON THE MATURITY DATE. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE NOTE AND UNPAID INTEREST THEN DUE. THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER. ACCORDINGLY, IF THIS LOAN HAS NOT BEEN SATISFIED, YOU WILL HAVE A BALLOON PAYMENT ON THE MATURITY DATE.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Addendum.

_____   10/25/06
- Borrower - RENADE A GRANT - Date -

DOCUJ3Z
DOCUJ3Z.VTX  05/24/2006

# ADDENDUM TO NOTE

## PREPAYMENT PENALTY - FIRST (24 ) MONTHS OF NOTE

Serv #: 11714927                                    Loan #: 11714927

This addendum is made this **25th** day of **October, 2006** , and is incorporated into and shall be deemed to amend and supplement the Note of the same date given by the undersigned (the "Borrower") to **WMC MORTGAGE CORP.**

(the "Lender") covering the property described in the Security Instrument and located at:
**1901 SOUTH ROOSEVELT BOULEVARD # 108N KEY WEST, FL 33040**

[Property Address]

To the extent that the provisions of this Prepayment Note Addendum (the "Addendum") are inconsistent with the provisions of the Security Instrument and/or the Note, the provisions of this Addendum shall prevail over and shall supercede any such inconsistent provisions of the Security Instrument and/or the Note.

Section **5** of the Note is amended to read in its entirety as follows:

## BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A prepayment of all of the unpaid principal is known as a "full prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment."

Except as provided below, I may make a full or partial prepayment at any time. If I make any partial prepayment, I must still make each later payment as it becomes due and in the payment amount established in accordance with the provisions of the Note. I may make a full prepayment at any time. However, if within the first **Twenty-Four** months after the execution of the Note, I make any prepayment(s) within any 12-month period the total amount of which exceeds **Twenty** percent ( **20.000** %) of the original principal amount of this loan, I will pay a prepayment charge in an amount equal to the payment of **Six** ( **6** ) months' advance interest on the amount by which the total of my prepayments(s) within that 12-month period exceeds **Twenty** percent ( **20.000** %) of the original principal amount of the loan.

_____

- Borrower - RENADE A GRANT - Date -    10/25/06

# EXHIBIT B

After Recording Return To:
WMC MORTGAGE CORP. -
POST CLOSING

1 RAMLAND RD

ORANGEBURG, NY 10962

Attn:    .(Equity
            Services)

This Document Prepared By:
MELBA FARAONE

WMC MORTGAGE CORP.

3100 THORNTON AVENUE

BURBANK, CA 91504

```
Doc# 1611523  11/07/2006   10:54AM
Filed & Recorded in Official Records of
MONROE COUNTY  DANNY L. KOLHAGE

11/07/2006  10:54AM
INTANGIBLE TAX   CL: PW     $1,087.50
MORTGAGE DOC STAMP   CL: PW  $1,903.30

Doc# 1611523
Bk# 2250 Pg# 477
```

---

[Space Above This Line For Recording Data]

# MORTGAGE

GRANT
Loan #: 11714927
MIN:   100136300117149277
PIN:   064700-000308

Serv #: 11714927

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "Security Instrument" means this document, which is dated **October 25, 2006**           , together with all Riders to this document.

**(B)** "Borrower" is **RENADE A GRANT**    A MARRIED MAN JOINED BY HIS WIFE
                  NARNIKE PIERRE

Borrower is the mortgagor under this Security Instrument.

**(C)** "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(D)** "Lender" is **WMC MORTGAGE CORP.**

Lender is a **Corporation**                         organized and existing under the laws of **CALIFORNIA**                  . Lender's address is    **3100 THORNTON AVE.,**
**BURBANK, CA 91504-3183**

**(E)** "Note" means the promissory note signed by Borrower and dated   **October 25, 2006**      . The Note states that Borrower owes Lender
**Five Hundred Forty-Three Thousand Seven Hundred Fifty And 00/100**
Dollars (U.S. $ **543,750.00**    ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **November 1, 2036**      .

**(F)** "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT            Form 3010 1/01       *(page 1 of 14 pages)*
DOCUKFL1
DOCUKFL1.VTX  08/25/2005

11714927                                                          11714927

**(G)** **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H)** **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider   ☒ Condominium Rider         ☐ Second Home Rider
☐ Balloon Rider           ☐ Planned Unit Development Rider   ☐ Biweekly Payment Rider
☐ 1-4 Family Rider        ☒ Other(s) [specify] **Balloon Rider**

**(I)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)** **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)** **"Escrow Items"** means those items that are described in Section 3.

**(M)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the

COUNTY                              of   **MONROE**                                            :
[Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]
**LEGAL  DESCRIPTION  ATTACHED  HERETO  AND  MADE  A  PART  HEREOF  AND
KNOWN  AS  EXHIBIT  'A'.**

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3010 1/01        *(page 2 of 14 pages)*
DOCUKFL2
DOCUKFL2.VTX  08/25/2005



Doc# 1611523
Bk# 2250   Pg# 479

11714927                                                                                                          11714927

which currently has the address of   **1901 SOUTH ROOSEVELT BOULEVARD # 108N**
                                       [Street]

**KEY WEST**                                          , Florida        **33040**              ("Property Address"):
[City]                                                                 [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
   1.   **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
       Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.
       2.   **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                Form 3010 1/01           *(page 3 of 14 pages)*
DOCUKFL3
DOCUKFL3.VTX   08/25/2005

DOC# 1811523
Bk# 2250   Pg# 480

11714927                                                                    11714927

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.   **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time durin g the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESP A, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by



Doc# 1611523
Bk# 2250  Pg# 481

11714927                                                                          11714927

RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing,

FLORIDA--Single Family--**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**                    Form 3010 1/01                    *(page 5 of 14 pages)*
DOCUKFL5
DOCUKFL5.VTX   08/25/2005

Doc# 1611523
Bk# 2250   Pg# 482

11714927                                                                           11714927

any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.   **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.   **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.   **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security



11714927                                                                                                                11714927

Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

FLORIDA--Single Family--**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**                    Form 3010 1/01                    *(page 7 of 14 pages)*
DOCUKFL7
DOCUKFL7.VTX   08/25/2005





Doc# 1611523
Bk# 2250 Pg# 484

11714927                                                                                        11714927

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.





Doc# 1611523
Bk# 2250  Pg# 485

11714927                                                                                                              11714927

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent



Doc# 1611523
Bk# 2250   Pg# 486

11714927                                                              11714927

by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall co ntinue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3010 1/01
DOCUKFL10                                                                             *(page 10 of 14 pages)*
DOCUKFLA.VTX   08/25/2005



Doc# 1611523
Bk# 2250   Pg# 487

11714927                                                                              11714927

(d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT            Form 3010 1/01            *(page 11 of 14 pages)*
DOCUKFL11
DOCUKFLB.VTX   08/25/2005

Doc# 1611523
Bk# 2250  Pg# 488

11714927                                                                                          11714927

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

Doc#: 1611523
Bk#: 2250  Pg#: 489

11714927                                                                                    11714927

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security
Instrument and in any Rider executed by Borrower and recorded with it.

_____  _____
- Borrower - RENADE A GRANT - Date

_____
          NARNIKE PIERRE

Signed, sealed and delivered in the presence of:

_____        _____
Witness                                     Witness

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3010 1/01        (page 13 of 14 pages)
DOCUKFL13
DOCUKFLD.VTX  08/25/2005

Doc# 1611523
Bk# 2250   Pg# 490

11714927                                                          11714927

[Space Below This Line For Acknowledgment]

**STATE OF** *Florida*
**COUNTY OF** *Broward*

The foregoing instrument was acknowledged before me this *October 25, 2006*                     by

*RENADE A GRANT AND NARNIKE PIERRE*

who is personally known to me or who has produced *Fl. Driver License* as identification.

GIGLIOLA R. BARRASSO
Notary Public - State of Florida
My Commission Expires Oct 19, 2009
Commission # DD 483328
Bonded By National Notary Assn.

Notary Public

My Commission Expires:

**FLORIDA**--Single Family--**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**                Form 3010 1/01                *(page 14 of 14 pages)*
DOCUKFL14
DOCUKFLE.VTX  08/25/2005

Doc# 1611523
Bk# 2250   Pg# 491

# Exhibit A

Unit 108, La Brisa North, a Condominium, according to the Declaration of Condominium, as recorded in Official Records Book 887, Page 1653, and all its attachments and amendments thereto, all in the Public Records of Monroe County, Florida, together with an undivided interest in the common elements appurtenant thereto.

Parcel Identification Number: 8656874

```
Doc# 1611523
Bk# 2250  Pg# 492
```

# ADJUSTABLE RATE RIDER
### (6-Month LIBOR Index - Rate Caps)
### (First Business Day of Preceding Month Lookback)

Serv #: 11714927

GRANT
Loan #: 11714927
MIN:   100136300117149277

      THIS ADJUSTABLE RATE RIDER is made this **25th**    day of **October, 2006**     , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure the Borrower's Adjustable Rate Note (the "Note") to **WMC MORTGAGE CORP.**

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

**1901 SOUTH ROOSEVELT BOULEVARD # 108N, KEY WEST, FL 33040**

[Property Address]

    **THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

    **ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.**     **INTEREST RATE AND MONTHLY PAYMENT CHANGES**
    The Note provides for an initial interest rate of   **8.620**     %. The Note provides for changes in the interest rate and the monthly payments, as follows:

**4.**     **INTEREST RATE AND MONTHLY PAYMENT CHANGES**
    **(A)**     **Change Dates**
    The interest rate I will pay may change on the first day of **November, 2008**     , and may change on that day every   **6th**    month thereafter. Each date on which my interest rate could change is called a "Change Date."

**MULTISTATE ADJUSTABLE RATE RIDER 6-Month LIBOR Index (First Business Day Lookback)--Single Family--**

11714927                                                      11714927

**(B)     The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the six month London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal.* The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C)     Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Six and Eighty-Five Hundredths** percentage point(s) ( **6.850** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on a date that is **10** years after the Maturity Date (such date being referred to herein as the "Amortization Date") at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment. I understand that as a result of the Amortization Date being after the Maturity Date, I will have a balloon payment on the Maturity Date.

**(D)     Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **11.620** % or less than **8.620** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One** percentage point(s) ( **1.000** %) from the rate of interest I have been paying for the preceding **6** months. My interest rate will never be greater than **15.120** %, or less than **8.620** %.

**(E)     Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)     Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.     TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

Doc# 1611523
Bk# 2250  Pg# 494

11714927                                                    11714927

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____   _10/25/06_
- Borrower - RENADE A GRANT - Date /-


_____

NARNIKE PIERRE

Doc# 1611523
Bk# 2250  Pg# 495

---

[Space Above This Line For Recording Data]

# BALLOON RIDER

GRANT
Loan #: 11714927
MIN:   10013630011714927

Serv #: 11714927

THIS BALLOON RIDER is made this **25th**      day of **October, 2006**    , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Note (the "Note") to **WMC MORTGAGE CORP.**

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:
**1901 SOUTH ROOSEVELT BOULEVARD # 108N KEY WEST, FL 33040**

[Property Address]

The interest rate stated on the Note is called the "Note Rate". The date of the Note is called the "Note Date". I understand the Lender may transfer the Note, Security Instrument and this Rider. The Lender or anyone who takes the Note, the Security Instrument and this Rider by transfer and who is entitled to receive payments under the Note is called the "Note Holder".

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements in the Security Instrument, Borrower and Lender further covenant and agree as follows (despite anything to the contrary contained in the Security Instrument or the Note):

**NOTWITHSTANDING THE   40  -YEAR AMORTIZATION PERIOD, THIS LOAN IS PAYABLE IN FULL ON THE MATURITY DATE. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN**

**BALLOON RIDER MULTISTATE  (01/97)**
DOCUJ4A1
DOCUJ4A1.VTX  05/24/2006                        Page 1 of 2

DOC# 1611523
Bk# 2250  Pg# 496

11714927                                                                      11714927

**IF YOU OBTAIN REFINANCING FROM THE SAME LENDER. ACCORDINGLY, IF THIS LOAN HAS NOT BEEN SATISFIED, YOU WILL HAVE A BALLOON PAYMENT ON THE MATURITY DATE.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Balloon Rider.

_____   10/25/06
- Borrower - RENADE A GRANT - Date -

_____

     NARNIKE PIERRE

**BALLOON RIDER MULTISTATE (01/97)**

DOCUJ4A2
DOCUJ4A2.VTX  05/24/2006                         Page 2 of 2

Doc# 1611523
Bk# 2250  Pg# 497

# CONDOMINIUM RIDER

Servicing #: 11714927

GRANT
Loan #: 11714927
MIN:   100136300117149277

    THIS CONDOMINIUM RIDER is made this **25th** day of **October, 2006**        , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to **WMC MORTGAGE CORP.**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at: **1901 SOUTH ROOSEVELT BOULEVARD # 108N, KEY WEST, FL 33040**

[Property Address]

The Property includes a unit in, together with an undivided interest in the common elements of, a condominium project known as:
**LA BRISA**

[Name of Condominium Project]

(the "Condominium Project"). If the owners association or other entity which acts for the Condominium Project (the "Owners Association") holds title to property for the benefit or use of its members or shareholders, the Property also includes Borrower's interest in the Owners Association and the uses, proceeds and benefits of Borrower's interest.

    **CONDOMINIUM COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

        **A.   Condominium Obligations.** Borrower shall perform all of Borrower's obligations under the Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i) Declaration or any other document which creates the Condominium Project; (ii) by-laws; (iii) code of regulations; and (iv) other equivalent documents. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**MULTISTATE CONDOMINIUM RIDER**–Single Family--Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**        Form 3140 1/01
DOCUROA1
DOCUROA1.VTX  08/25/2005     *(page 1 of 3 pages)*

Doc# 1611523
Bk# 2250   Pg# 498

11714927                                                                    11714927

**B.   Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy on the Condominium Project which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, from which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C.   Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D.   Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E.   Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F.   Remedies.** If Borrower does not pay condominium dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Doc# 1611523
Bk# 2250  Pg# 499

11714927                                                                    11714927

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Condominium Rider.

_____  10/25/06
- Borrower - RENADE A GRANT - Date -

_____
NARNIKE PIERRE

MONROE COUNTY
OFFICIAL RECORDS

**MULTISTATE CONDOMINIUM RIDER--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**          Form 3140 1/01
DOCUROA3
DOCUROA3.VTX  08/25/2005          *(page 3 of 3 pages)*

# EXHIBIT C

```
Doc# 1810612  10/25/2010   10:29AM
Filed & Recorded in Official Records of
MONROE COUNTY  DANNY L. KOLHAGE

Doc# 1810612
Bk# 2488  Pg# 2184


      This space is for recording purposes only
```

Prepared by:         DAVID J. STERN, ESQ
Record &Return to:   900 South Pine Island Road Suite 400
                     Plantation, FL 33324-3920
                     08-73696CWF

MIN: 100136300117149277
MERS PHONE NUMBER: 1-888-679-6377

### ASSIGNMENT OF MORTGAGE
*KNOW ALL MEN BY THESE PRESENTS:*

*THAT* MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., as nominee for WMC MORTGAGE CORP.

Residing or located at c/o COUNTRYWIDE HOME LOANS, INC., 7105 CORPORATE DRIVE, MAILSTOP PTX-B-35 PLANO, TX 75024, herein designated as the assignor, for and in consideration of the sum of $1.00 Dollar and other good and valuable consideration, the receipt of which is hereby acknowledged, does hereby grant, bargain, sell, assign, transfer and set over unto DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF MORGAN STANLEY ABS CAPITAL I INC. TRUST 2007-HE5 MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2007-HE5 residing or located at: C/O COUNTRYWIDE HOME LOANS, INC. 7105 CORPORATE DRIVE, MAILSTOP PTX-B-35 PLANO, TX 75024 herein designated as the assignee, the mortgage executed by RENADE A. GRANT, A MARRIED MAN JOINED BY HIS WIFE NARNIKE PIERRE  recorded in MONROE County, Florida at book 2250 and page 477 encumbering the property more particularly described as follows:

**UNIT 108, LA BRISA NORTH, A CONDOMINIUM, ACCORDING TO THE DECLARATION OF CONDOMINIUM, AS RECORDED IN OFFICIAL RECORDS BOOK 887, PAGE 1653, AND ALL ITS ATTACHMENTS AND AMENDMENTS THERETO, ALL IN THE PUBLIC RECORDS OF MONROE COUNTY, FLORIDA, TOGETHER WITH AN UNDIVIDED INTEREST IN THE COMMON ELEMENTS APPURTENANT THERETO.**

Together with the note and each and every other obligation described in said mortgage and the money due and to become due thereon

TO HAVE AND TO HOLD the same unto the said assignee forever, but without recourse on the undersigned.


Pursuant to the provisions of Sec. 689.071, Florida Statutes, the within named Trustee has the power and authority to protect, conserve and to sell, or to lease, or to encumber, or otherwise to manage and dispose of the above-described mortgage and the real property encumbered thereby.

*In Witness Whereof,* the said Assignor has hereunto set his hand and seal or caused these presents to be signed by its proper corporate officers and its corporate seal to be hereto affixed , this 23 day of march 2010, but effective as of the 12th day of June, 2008.

                          MORTGAGE  ELECTRONIC  REGISTRATION  SYSTEMS,
                          INC., as nominee for WMC MORTGAGE CORP.,
                                        (CORPORATE SEAL)

ATTEST:                   BY:
WITNESS:                  PRINT NAME:
                          TITLE:  **Lisa Allinson - Vice President**
Print Name:  **Hester Murray**

WITNESS:
Print Name:  WENDY COLE

STATE OF  **California**
COUNTY OF  **Ventura**

PERSONALLY  APPEARED  BEFORE  ME,  the  undersigned  authority  in  and  for  the  aforesaid  county  and state,  on  this  the  ____  day  of  _____,  2010,  within  my  jurisdiction,  the  within  named **Lisa Allinson** who  is  personally  known  to  me  and  who  acknowledged  to  me  that  (s)he  is **VICE PRESIDENT** and  that  he,  and  on  behalf  of  MORTGAGE  ELECTRONIC REGISTRATION  SYSTEMS,  INC.,  as  nominee  for  WMC  MORTGAGE  CORP.,  and  as  its  act  and  deed  (s)he executed  the  above  and  foregoing  instrument,  after  first  having  been  duly  authorized  by  MORTGAGE  ELECTRONIC REGISTRATION  SYSTEMS,  INC.,  as  nominee  for  WMC  MORTGAGE  CORP.,  to  do  so.

WITNESS  my  hand  and  official  seal  in  the  County  and  State  last  aforesaid  this  ____  day  of _____,  2010.

                          _____
____                      NOTARY PUBLIC

*PBM*  *F08-73696*  *D1104*

# ACKNOWLEDGMENT

State of <u>California</u>
County of <u>Ventura</u>

Doc# 1810612
Bk# 2488  Pg# 2185

On ___<u>3/23/2010</u>___, before me, <u>Cathy Ritchie</u>, a notary public, personally appeared <u>Lisa Allinson</u> who provided to me on basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacities and, that by her signature on the instrument the persons, or the entity upon behalf of which the persons acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

CATHY RITCHIE
Commission # 1880813
Notary Public - California
Ventura County
My Comm. Expires Feb 22, 2014

MONROE COUNTY
OFFICIAL RECORDS

# EXHIBIT D

GARY W. OTT
RECORDER, SALT LAKE COUNTY, UTAH
830 SELECT PORTFOLIO SERVICING
PO BOX 65250
SLC UT 84165
11496918
Book 10068 Pages 5848-5856
10/22/2012 01:51 PM  26.00
---------------------------

## LIMITED POWER OF ATTORNEY

### KNOW ALL PERSONS BY THESE PRESENTS:

That, pursuant to the authority granted under certain servicing agreements (the "Servicing Agreements") by Deutsche Bank National Trust Company, a non-deposit trust company, in its capacity as trustee for the trusts identified in the Attachment hereto ("Trustee"), Bank of America, N.A., a national banking association ("BANA"), by these presents does hereby make, constitute and appoint Select Portfolio Servicing, Inc., a Utah corporation ("Subservicer"), Trustee's true and lawful agent and attorney-in-fact, and hereby grants it authority and power to take, through its duly authorized officers and designated agents, the Actions (as such term is defined herein) in Trustee's name, place and stead. This limited power of attorney (the "Limited Power of Attorney") is given in connection with and pursuant to a certain Flow Subservicing Agreement dated as of February 13, 2012 (the "Agreement") by and between BANA and Subservicer, pursuant to which Subservicer has the duty to provide servicing, administration, and management and disposition services with respect to certain mortgage loans ("Mortgage Loans") serviced by BANA as servicer and held by Trustee as trustee (the "Servicing Arrangement"). Each of the Mortgage Loans comprises a promissory note evidencing a right to payment and performance secured by a security interest or other lien on real property ("Property") evidenced by one or more mortgages, deeds of trust, deeds to secure debt or other forms of security instruments (each, a "Security Instrument").   The assignment of a Security Instrument, as used herein, shall also include the assignment of the beneficial interest under a deed of trust.

As used above, the term "Actions" shall mean and be limited to the following acts, in each case with respect to one or another of the Mortgage Loans or the Property and as mandated or permitted by federal, state or local laws or other legal requirements or restrictions—including without limitation federal and state debt collection laws—applicable to BANA or Subservicer in connection with mortgage loans serviced by Subservicer for BANA or on behalf of Trustee, as trustee:

1. Demand, sue for, recover, collect and receive each and every sum of money, debt, account and interest (which now is or hereafter shall become due and payable) belonging to or claimed by Trustee in respect of the Mortgage Loans and Property, and to use or take any lawful means for recovery by legal process or otherwise, including but not limited to the substitution of trustee under a deed of trust, the preparation and issuance of statements of breach, notices of default, and/or notices of sale (or any other statement or notice that is now or hereafter becomes necessary or appropriate to protect or enforce Trustee's interest in the Mortgage Loans and Property), filing proofs of claim, motions for relief from the automatic stay or other writings in a bankruptcy proceeding, taking deeds in lieu of foreclosure, negotiating and entering into "cash for keys" agreements, evicting and foreclosing on the Properties.

2. Subordinate the lien of a mortgage or deed of trust to an easement in favor of a public utility company or a government agency or unit with powers of eminent domain, including but not limited to the execution of partial satisfactions and releases and partial reconveyances reasonably required for such purpose, and the execution or requests to the trustees to accomplish the same.

3. Execute and/or file such documents and take such action as is proper and necessary to defend Trustee in litigation and to resolve any litigation where Subservicer has an obligation to defend Trustee.

4. Transact business of any kind regarding the Mortgage Loans, as Trustee's act and deed, to contract for, purchase, receive and take possession and evidence of title in and to the Property and/or to secure payment of a promissory note or performance of any obligation or agreement relating thereto.

5. Execute, complete, indorse or file bonds, notes, Security Instruments and other contracts, agreements and instruments regarding the borrowers and/or the Property, including but not limited to the execution of releases, satisfactions, reconveyances, assignments, loan modification agreements, loan assumption agreements, subordination agreements, property adjustment agreements, and other instruments pertaining to Security Instruments, bills of sale and execution of deeds and associated instruments, if any, conveying or encumbering the Property, in the interest of Trustee.

6. Correct or otherwise remedy any errors or deficiencies contained in any transfer or reconveyance documents provided or prepared by Trustee or a prior transferor, including, but not limited to note indorsements.

7. Convey the Property to the mortgage insurer, or close the title to the Property to be acquired as real estate owned, or convey title to real estate owned property ("REO Property").

8. Execute and deliver the following documentation with respect to the sale of REO Property acquired through a foreclosure or deed-in lieu of foreclosure, including, without limitation: listing agreements; purchase and sale agreements; grant/warranty/quit claim deeds or any other deed causing the transfer of title of the property to a party contracted to purchase same; escrow instructions; and any and all documents necessary to effect the transfer of REO Property.

9. Perform all steps necessary to realize on insurance proceeds, including but not limited to insurance proceeds relating to foreclosures, short sales, deeds in lieu of foreclosure, sale of REO Property, and the exercise of any rights of Trustee under any insurance agreement.

10. Endorse on behalf of Trustee all checks, drafts and/or other negotiable instruments made payable to Trustee.

With respect to the Actions, BANA gives to said attorney-in-fact full power and authority to execute such instruments and to do and perform all and every act and thing requisite, necessary and proper to carry into effect the power or powers granted by or under this Limited Power of Attorney as fully, to all intents and purposes, as BANA itself might or could do pursuant to the authority referenced above.

BANA represents to those dealing with such attorney-in-fact that they may rely upon this Limited Power of Attorney until they receive actual notice of termination or revocation thereof or unless an instrument of revocation has been recorded. Any and all third parties dealing with Subservicer as Trustee's attorney-in-fact may rely completely, unconditionally and conclusively on the authority of Subservicer, and need not make any inquiry about whether Subservicer is acting pursuant to the Servicing Arrangement. Any purchaser, title insurance company, public official or other third party may rely upon a written statement by Subservicer that any subject mortgage loan or real estate owned by Trustee or by Subservicer for Trustee as a result of the termination of the related Mortgage Loan, is subject to the authority and power of BANA under the Servicing Agreements and conferred to Subservicer pursuant to the Servicing Arrangement and this Limited Power of Attorney.

Nothing contained herein shall be construed to grant Subservicer the power to (i) initiate or defend any suit, litigation, or proceeding in the name of Trustee or BANA or be construed to create a duty of Trustee or BANA to initiate or defend any suit, litigation, or proceeding in the name of Subservicer, (ii) incur or agree to any liability or obligation in the name or on behalf of Trustee or BANA, or (iii) execute any document or take any action on behalf of, or in the name, place, or stead of, Trustee or BANA, except, in each case, as provided herein.

*[Remainder of page intentionally left blank]*

**IN WITNESS WHEREOF,** Bank of America, N.A. has executed this Limited Power of Attorney this 17th day of October, 2012.

BANK OF AMERICA, N. A.

By: _____
Name:   Debra J. Minton
Title:    Senior Vice President

By: _____
Name:   Greg Blackmer
Title:    Vice President

Witness: _____
Name:   Kathy Jackson
Title:    Assistant Vice President

Witness: _____
Name:   Debra Ham
Title:    Assistant Vice President

STATE OF FLORIDA  :

                : ss.

DUVAL COUNTY:

On the 17th day of October in the year 2012, before me, the undersigned, personally appeared Debra J. Minton, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that the individual executed the same in his or her capacity, and that by his or her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

NOTARY PUBLIC-STATE OF FLORIDA
Margaret Donnelly
Commission # EE026066
Expires:   SEP. 14, 2014
BONDED THRU ATLANTIC BONDING CO., INC.

Notary Public   Margaret Donnelly
My commission expires:  09/14/2014

ATTACHMENT

**Trusts Covered By The Limited Power Of Attorney**

1.      Pooling and Servicing Agreement, dated as of June 1, 2004 (as amended, restated, supplemented, or otherwise modified from time to time), among GS Mortgage Securities Corp., as Depositor, Countrywide Home Loans Servicing LP, as Servicer, Ameriquest Mortgage Company, as Responsible Party and Deutsche Bank National Trust Company, as Trustee, related to the **GSAMP Trust 2004-AR1 Mortgage Pass-Through Certificates, Series 2004-AR1**

2.      Pooling and Servicing Agreement dated as of August 1, 2004 (as amended, restated, supplemented, or otherwise modified from time to time), among GS Mortgage Securities Corp., as Depositor, Countrywide Home Loans Servicing LP, as Servicer, Ameriquest Mortgage Company, as Responsible Party and Deutsche Bank National Trust Company, as Trustee, related to the **GSAMP Trust 2004-AR2 Mortgage Pass-Through Certificates, Series 2004-AR2**

3.      Pooling and Servicing Agreement, dated as of July 1, 2004 (as amended, restated, supplemented, or otherwise modified from time to time), among GS Mortgage Securities Corp., as Depositor, Countrywide Home Loans Servicing LP, as Servicer, Chase Manhattan Mortgage Corporation, as Servicer, Ocwen Federal Bank FSB, as Servicer, Ameriquest Mortgage Company, as Responsible Party and Deutsche Bank National Trust Company, as Trustee, related to the **GSAMP Trust 2004-HE2 Mortgage Pass-Through Certificates, Series 2004-HE2**

4.      Pooling and Servicing Agreement, dated as of May 1, 2005 (as amended, restated, supplemented, or otherwise modified from time to time), among GS Mortgage Securities Corp., as Depositor, Countrywide Home Loans Servicing LP, as Servicer and Deutsche Bank National Trust Company, as Trustee, related to the **GSAMP Trust 2005-AHL Mortgage Pass-Through Certificates, Series 2005-AHL**

5.      Pooling and Servicing Agreement, dated as of January 1, 2005 (as amended, restated, supplemented, or otherwise modified from time to time), among GS Mortgage Securities Corp., as Depositor, Countrywide Home Loans Servicing LP, as Servicer, JPMorgan Chase Bank, National Association, as Servicer, Ocwen Federal Bank FSB, as Servicer and Deutsche Bank National Trust Company, as Trustee, related to the **GSAMP Trust 2005-HE1 Mortgage Pass-Through Certificates, Series 2005-HE1**

6.      Pooling and Servicing Agreement, dated as of March 1, 2005 (as amended, restated, supplemented, or otherwise modified from time to time), among GS Mortgage Securities Corp., as Depositor, Countrywide Home Loans Servicing LP, as Servicer, JPMorgan Chase Bank, National Association, as Servicer, J.P. Morgan Trust Company, National Association, as Custodian and Deutsche Bank National Trust Company, as Trustee, related to the **GSAMP Trust 2005-HE2 Mortgage Pass-Through Certificates, Series 2005-HE2**

7.      Pooling and Servicing Agreement, dated as of June 1, 2005 (as amended, restated, supplemented, or otherwise modified from time to time), among GS Mortgage Securities Corp., as Depositor, NC Capital Corporation, as Responsible Party, Countrywide Home Loans Servicing LP, as Servicer, JPMorgan Chase Bank, National Association, as Servicer, Wilshire Credit Corporation, as Servicer, J.P. Morgan Trust Company, National Association, as Custodian, Wells Fargo Bank, N.A., as Custodian and Deutsche Bank National Trust Company, as Trustee, related to the **GSAMP Trust 2005-HE3 Mortgage Pass-Through Certificates, Series 2005-HE3**

8.      Pooling and Servicing Agreement, dated as of February 1, 2004 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Chase Manhattan Mortgage Corporation, as Servicer, Countrywide Home Loans Servicing LP., as Servicer, AAMES Capital Corporation, as Responsible Party, Accredited Home Lenders, Inc., as Responsible Party, NC Capital Corporation, as Responsible Party Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2004-HE1 Mortgage Pass-Through Certificates, Series 2004-HE1**

9.      Pooling and Servicing Agreement, dated as of April 1, 2004 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Chase Manhattan Mortgage Corporation, as Servicer, Countrywide Home Loans Servicing LP., as Servicer, HomeQ Servicing Corporation, as Servicer, AAMES Capital Corporation, as Responsible Party, Accredited Home Lenders, Inc., as Responsible Party, NC Capital Corporation, as Responsible Party and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2004-HE2 Mortgage Pass-Through Certificates, Series 2004-HE2**

10.     Pooling and Servicing Agreement, dated as of June 1, 2004 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Chase Manhattan Mortgage Corporation, as Servicer, Countrywide Home Loans Servicing LP., as Servicer, HomeQ Servicing Corporation, as Servicer, AAMES Capital Corporation, as Responsible Party, Accredited Home Lenders, Inc., as Responsible Party, NC Capital Corporation, as Responsible Party and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2004-HE4 Mortgage Pass-Through Certificates, Series 2004-HE4**

11.     Pooling and Servicing Agreement, dated as of August 1, 2004 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Chase Manhattan Mortgage Corporation, as Servicer, Countrywide Home Loans Servicing LP., as Servicer, HomeQ Servicing Corporation, as Servicer, Accredited Home Lenders, Inc., as Responsible Party, NC Capital Corporation, as Responsible Party and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2004-HE6 Mortgage Pass-Through Certificates, Series 2004-HE6**

12.     Pooling and Servicing Agreement, dated as of August 1, 2004 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Chase Manhattan Mortgage Corporation, as Servicer, Countrywide Home Loans Servicing LP., as Servicer, HomeQ Servicing Corporation, as Servicer, New Century Mortgage Corporation, as Servicer, AAMES Capital Corporation, as Responsible Party, Mila, Inc., as Responsible Party, NC Capital Corporation, as Responsible Party and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2004-HE7 Mortgage Pass-Through Certificates, Series 2004-HE7**

13.     Pooling and Servicing Agreement, dated as of October 1, 2004 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Chase Manhattan Mortgage Corporation, as Servicer, Countrywide Home Loans Servicing LP., as Servicer, New Century Mortgage Corporation, as Servicer, AAMES Capital Corporation, as Responsible Party, NC Capital Corporation, as Responsible Party and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2004-HE8 Mortgage Pass-Through Certificates, Series 2004-HE8**

14.     Pooling and Servicing Agreement, dated as of November 1, 2004 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Countrywide Home Loans Servicing LP., as Servicer, AAMES Capital Corporation, as Responsible Party, NC Capital Corporation, as Responsible Party, Accredited Home Lenders, Inc., as Responsible Party and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2004-HE9 Mortgage Pass-Through Certificates, Series 2004-HE9**

15.     Pooling and Servicing Agreement, dated as of February 1, 2004 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Countrywide Home Loans Servicing LP., as Servicer, NC Capital Corporation, as Responsible Party and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2004-NC2 Mortgage Pass-Through Certificates, Series 2004-NC2**

16.     Pooling and Servicing Agreement, dated as of April 1, 2004 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Countrywide Home Loans Servicing LP., as Servicer, NC Capital Corporation, as Responsible Party and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2004-NC3 Mortgage Pass-Through Certificates, Series 2004-NC3**

17.     Pooling and Servicing Agreement, dated as of June 1, 2004 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Countrywide Home Loans Servicing LP., as Servicer, NC Capital Corporation, as Responsible Party and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2004-NC5 Mortgage Pass-Through Certificates, Series 2004-NC5**

18.     Pooling and Servicing Agreement, dated as of November 1, 2004 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Chase Manhattan Mortgage Corporation, as Servicer, Countrywide Home Loans Servicing LP., as Servicer, New Century Mortgage Corporation, as Servicer, NC Capital Corporation, as Responsible Party and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2004-NC8 Mortgage Pass-Through Certificates, Series 2004-NC8**

19.     Pooling and Servicing Agreement, dated as of December 1, 2004 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Countrywide Home Loans Servicing LP., as Servicer, WMC Mortgage Corp., as Responsible Party and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2004-WMC3 Mortgage Pass-Through Certificates, Series 2004-WMC3**

20.     Pooling and Servicing Agreement, dated as of January 1, 2005 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Countrywide Home Loans Servicing LP., as Servicer, HomeQ Servicing Corporation, as Servicer, Decision One Mortgage Company LLC, as Responsible Party, Option One Mortgage Corporation, as Responsible Party and Servicer, NC Capital Corporation, as Responsible Party, Accredited Home Lenders, Inc., as Responsible Party, Wells Fargo Bank, National Association, as Custodian and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2005-HE1 Mortgage Pass-Through Certificates, Series 2005-HE1**

21.     Pooling and Servicing Agreement, dated as of March 1, 2005 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Option One Mortgage Corporation, as Responsible Party and Servicer, Countrywide Home Loans Servicing LP., as Servicer, HomeQ Servicing Corporation, as Servicer, Decision One Mortgage Company LLC, as Responsible Party, NC Capital Corporation, as Responsible Party, Accredited Home Lenders, Inc., as Responsible Party, AAMES Capital Corporation, as Responsible Party, Wells Fargo Bank, National Association, as Custodian and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2005-HE2 Mortgage Pass-Through Certificates, Series 2005-HE2**

22.     Pooling and Servicing Agreement, dated as of April 1, 2005 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, HomeQ Servicing Corporation, as Servicer, Countrywide Home Loans Servicing LP., as Servicer, NC Capital Corporation, as Responsible Party and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2005-NC2 Mortgage Pass-Through Certificates, Series 2005-NC2**

23.     Pooling and Servicing Agreement, dated as of February 1, 2005 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Countrywide Home Loans Servicing LP., as Servicer, WMC Mortgage Corp., as Responsible Party, Wells Fargo Bank, National Association, as Custodian and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2005-WMC1 Mortgage Pass-Through Certificates, Series 2005-WMC1**

24.     Pooling and Servicing Agreement, dated as of June 1, 2006 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Countrywide Home Loans Servicing LP., as Servicer, Wells Fargo Bank, National Association, as Servicer and Custodian, HomeQ Servicing Corporation, as Servicer, New Century Mortgage Corporation, as Servicer, NC Capital Corporation, as Responsible Party, WMC Mortgage Corp., as Responsible Party, Decision One Mortgage Company, LLC, as Responsible Party and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2006-HE5 Mortgage Pass-Through Certificates, Series 2006-HE5**

25.     Pooling and Servicing Agreement, dated as of September 1, 2006 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Countrywide Home Loans Servicing LP., as Servicer, Wells Fargo Bank, National Association, as Servicer and Custodian, New Century Mortgage Corporation, as Servicer, NC Capital Corporation, as Responsible Party, WMC Mortgage Corp., as Responsible Party, Decision One Mortgage Company, LLC, as Responsible Party, LaSalle Bank National Association, as Custodian and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2006-HE6 Mortgage Pass-Through Certificates, Series 2006-HE6**

26.     Pooling and Servicing Agreement, dated as of October 1, 2006 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Countrywide Home Loans Servicing LP., as Servicer, New Century Mortgage Corporation, as Servicer, NC Capital Corporation, as Responsible Party, WMC Mortgage Corp., as Responsible Party, Decision One Mortgage Company, LLC, as Responsible Party, Wells Fargo Bank, National Association, as Custodian, LaSalle Bank National Association, as Custodian and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2006-HE7 Mortgage Pass-Through Certificates, Series 2006-HE7**

27.     Pooling and Servicing Agreement, dated as of November 1, 2006 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Wells Fargo Bank, National Association, as Master Servicer, Securities Administrator and Custodian, Saxon Mortgage Services, Inc., as Servicer, Countrywide Home Loans Servicing LP, as Servicer, New Century Mortgage Corporation, as Servicer, NC Capital Corporation, as Responsible Party, WMC Mortgage Corp., as Responsible Party, Decision One Mortgage Company, LLC, as Responsible Party, LaSalle Bank National Association, as Custodian and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2006-HE8 Mortgage Pass-Through Certificates, Series 2006-HE8**

28.     Pooling and Servicing Agreement, dated as of November 1, 2006 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Countrywide Home Loans Servicing LP, as Servicer, New Century Mortgage Corporation, as Servicer, NC Capital Corporation, as Responsible Party and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2006-NC5 Mortgage Pass-Through Certificates, Series 2006-NC5**

29.     Pooling and Servicing Agreement, dated as of January 1, 2007 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Saxon Mortgage Services, Inc., as Servicer, Countrywide Home Loans Servicing LP, as Servicer, NC Capital Corporation, as Responsible Party, Decision One Mortgage Company, LLC, as Responsible Party, LaSalle Bank National Association, as Custodian and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2007-HE1 Mortgage Pass-Through Certificates, Series 2007-HE1**

30.     Pooling and Servicing Agreement, dated as of February 1, 2007 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Saxon Mortgage Services, Inc., as Servicer, Countrywide Home Loans Servicing LP, as Servicer, Wells Fargo Bank, National Association, as Servicer and Custodian, New Century Mortgage Corporation, as Servicer, NC Capital Corporation, as Responsible Party, WMC Mortgage Corp., as Responsible Party, Decision One Mortgage Company, LLC, as Responsible Party, LaSalle Bank National Association, as Custodian and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2007-HE2 Mortgage Pass-Through Certificates, Series 2007-HE2**

31.     Pooling and Servicing Agreement, dated as of February 1, 2007 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Saxon Mortgage Services, Inc., as Servicer, Countrywide Home Loans Servicing LP, as Servicer, NC Capital Corporation, as Responsible Party, Wells Fargo Bank, National Association, as Custodian and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2007-HE3 Mortgage Pass-Through Certificates, Series 2007-HE3**

32.     Pooling and Servicing Agreement, dated as of April 1, 2007 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Wells Fargo Bank, National Association, as Master Servicer, Securities Administrator and Custodian, Saxon Mortgage Services, Inc., as Servicer, Countrywide Home Loans Servicing LP, as Servicer, WMC Mortgage Corp., as Responsible Party, Decision One Mortgage Company, LLC, as Responsible Party, LaSalle Bank National Association, as Custodian and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2007-HE5 Mortgage Pass-Through Certificates, Series 2007-HE5**

33.     Pooling and Servicing Agreement, dated as of May 1, 2007 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Wells Fargo Bank, National Association, as Master Servicer, Securities Administrator and Custodian, Saxon Mortgage Services, Inc., as Servicer, Countrywide Home Loans Servicing LP, as Servicer, WMC Mortgage Corp., as Responsible Party, Decision One Mortgage Company, LLC, as Responsible Party, LaSalle Bank National Association, as Custodian and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2007-HE6 Mortgage Pass-Through Certificates, Series 2007-HE6**

34.     Pooling and Servicing Agreement, dated as of September 1, 2007 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Wells Fargo Bank, National Association, as Master Servicer, Securities Administrator and Custodian, Saxon Mortgage Services, Inc., as Servicer, Countrywide Home Loans Servicing LP, as Servicer, LaSalle Bank National Association, as Custodian and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2007-HE7 Mortgage Pass-Through Certificates, Series 2007-HE7**

35.     Pooling and Servicing Agreement, dated as of January 1, 2007 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Countrywide Home Loans Servicing LP, as Servicer, Saxon Mortgage Services, Inc., as Servicer, NC Capital Corporation, as Responsible Party and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2007-NC1 Mortgage Pass-Through Certificates, Series 2007-NC1**

36.     Pooling and Servicing Agreement, dated as of April 1, 2007 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Wells Fargo Bank, National Association, as Master Servicer and Securities Administrator, Saxon Mortgage Services, Inc., as Servicer, Countrywide Home Loans Servicing LP, as Servicer, and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley ABS Capital I Inc. Trust 2007-NC2 Mortgage Pass-Through Certificates, Series 2007-NC2**

37.     Pooling and Servicing Agreement, dated as of February 1, 2007 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Saxon Mortgage Services, Inc., as Servicer, Wells Fargo Bank, National Association, as Servicer and Custodian, Countrywide Home Loans Servicing LP, as Servicer, First NLC Financial Services, LLC, as Responsible Party and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley Home Equity Loan Trust 2007-1 Mortgage Pass-through Certificates, Series 2007-1**

38.     Pooling and Servicing Agreement, dated as of March 1, 2007 (as amended, restated, supplemented, or otherwise modified from time to time), among Morgan Stanley ABS Capital I Inc., as Depositor, Wells Fargo Bank, National Association, as Master Servicer, Securities Administrator and Servicer, Saxon Mortgage Services, Inc., as Servicer, Countrywide Home Loans Servicing LP, as Servicer, First NLC Financial Services, LLC, as Responsible Party and Deutsche Bank National Trust Company, as Trustee, related to the **Morgan Stanley Home Equity Loan Trust 2007-2 Mortgage Pass-through Certificates, Series 2007-2**

39.     Pooling and Servicing Agreement, dated as of May 15, 2005 (as amended, restated, supplemented, or otherwise modified from time to time), among Financial Asset Securities Corp., as Depositor, Countrywide Home Loans Servicing LP, as Servicer and Deutsche Bank National Trust Company, as Trustee, related to the **Soundview Home Loan Trust 2005-DO1 Asset-Backed Certificates, Series 2005-DO1**

40.     Pooling and Servicing Agreement, dated as of March 1, 2007 (as amended, restated, supplemented, or otherwise modified from time to time), among Financial Asset Securities Corp., as Depositor, Countrywide Home Loans Servicing LP, as Servicer and Deutsche Bank National Trust Company, as Trustee, related to the **Soundview Home Loan Trust 2007-WMC1 Asset-Backed Certificates, Series 2007-WMC1**